UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| JOSHUA BENTLEY,<br><br>     Plaintiff,<br><br>v.<br><br>CITY OF EAST MOLINE, MATTHEW SHATTUCK, and KYLE SCHULTZ,<br><br>     Defendants. | Case No. 4:15-cv-04016-SLD-JEH |

<u>ORDER</u>

  Before the Court is a Motion for Summary Judgment, ECF No. 31, filed by Defendants City of East Moline and City of East Moline Police Officers Kyle Schultz and Matthew Shattuck ("Officers").[1] Plaintiff Joshua Bentley filed claims for false arrest, malicious prosecution, and unreasonable search and seizure against the defendant Officers under 42 U.S.C. § 1983, and indemnification claims against the City of East Moline under 745 ILCS 10/9-102. For the following reasons, the motion is GRANTED regarding the malicious prosecution claims in Counts III and IV, and the Fourth Amendment violations alleged in Counts V, VI, and DENIED regarding the false arrest claims, Counts I and II.

**BACKGROUND[2]**

  The events at issue center on the arrest of Joshua Bentley by Officers Matthew Shattuck and Kyle Schultz on July 4, 2013. Joshua Bentley is a resident of East Moline, Illinois. He lives

---

[1] Bentley has also filed a Motion for Leave to File Excess Pages, ECF No. 33, for his Response to the Motion for Summary Judgment ("Resp."), ECF No. 34. The Court grants the motion.
[2] When evaluating a motion for summary judgment, the court draws "all reasonable inferences from undisputed facts in favor of the nonmoving party and [views] the disputed evidence in the light most favorable to the nonmoving party." *Harney v. Speedway SuperAmerica*, LLC, 526 F.3d 1099, 1104 (7th Cir. 2008). Accordingly, the material set forth herein, unless otherwise noted, is based on the undisputed facts ("UMF") in Defendant's Motion for Summary Judgment and Pl.'s Resp. Mot. Summ. J., ECF No. 34. Disputed material facts will be identified as "Pl.'s DMF __" or "Def.'s DMF __."

in a two-story building, where he occupies the unit on the second floor. The unit is accessible by staircases in both front and back. The back staircase is on Bentley's property, and leads to a gravel parking area that is also Bentley's property. The lot abuts a public alley. The East Moline Police Department ("the Department") is located across the street, with an entrance on the alley.

On July 3, 2013, Bentley's friend Jason Stirk called his mother, Karen Smith. Smith called the Department on the morning of July 4, 2013, and stated to the officer on the phone that Stirk and his friend were going to "create a disturbance" at the Fourth of July parade. UMF 17. Smith relayed to the officer that Stirk had told her he would probably be arrested for the disturbance he planned to cause. Smith incorrectly identified Bentley during the call as Stirk's friend "Josh Bennett." Department Lieutenant Jon Showalter relayed the information to Officers Shattuck and Schultz, who believed based on this information that Stirk and "Josh Bennett" were going to create a disturbance.

The officers used a database to identify Stirk's driver's license photo and set out to investigate the tip. Both were in plainclothes, and it is contested as to whether their badges, guns, and radios were visible on their person. Pl.'s DMF 24. After patrolling the parade route to locate Stirk, the officers returned to the Department and learned that a Joshua Bentley resided on the 900 block of 15th Avenue in East Moline. Officer Schultz walked outside of the Department entrance across from Bentley's apartment and recognized Stirk sitting on the back stairs. Both Officers walked over and engaged Stirk in conversation as he remained seated on the staircase. Officer Shattuck ascended several steps up the staircase to do so. Bentley, hearing voices outside his window, looked outside and saw Officer Shultz on his property. He yelled at Schultz multiple times to get off his property. From the window, Bentley could see Officer Schultz indicating to his waist, which Officer Schultz stated occurred when he "displayed [his] badge."

Schultz Dep. 30:7 – 14; Bentley Dep. 62:22–63:9.  Bentley exited down the front stairs of his house and walked around to the gravel lot in the back alley, stopping about ten feet from Shultz. Bentley repeated several times that the officers were trespassing and needed to leave.

It is disputed as to whether or when the Officers identified themselves as police. Bentley stated that "[t]he word police officer was never spoken out loud never once." Bentley Dep. 49:24. Officer Schultz told Bentley that they were trying to conduct an investigation. Schultz 33:5–13. Bentley continued to state that the Officers needed to leave the property, saying "I don't really need to talk to you about anything . . . you are trespassing." Bentley Dep. 48:23–25. Though Bentley was speaking loudly and the Officers stated that he was "visually upset," Schultz Dep. 52:16, he never made physical contact with the officers or physically prevented the officers from doing their jobs. Stirk and Bentley both describe Bentley's behavior during the interaction as "matter of fact," Bentley Dep. 64:10–13; Stirk Dep. 36:8, while Officer Shattuck said Bentley was "continuing to yell. He would not listen. He would not let Detective Schultz explain or myself explain anything to him and continuing to try to interrupt my conversation with Mr. Stirk." Shattuck Dep. 54:13 – 55:6.

Officer Shattuck stated to Bentley that he needed to provide identification or he was going to be arrested. Bentley responded by slapping his left pocket to indicate that he did not have identification on him, and said "I don't have any." Officer Shattuck descended the stairs and said, "either you show me some ID or I'm going to arrest you." Shattuck made the decision to arrest Bentley after two to three minutes of the encounter. Schultz Dep. 38:8–9. Bentley was arrested for Resisting – Obstructing a Police Officer in violation of 720 ILCS 5/31-1. Both Officers handcuffed him and walked him over to the Department, where he was bailed out on the same day. The Officers did not return to speak with Stirk after the arrest. The Officers both

presented the case to the State's Attorney on or around July 8, 2013, and the attorney "chose not to file charges at that time," Shattuck Dep. 60:16–18, leaving open the possibility of filing charges within eighteen months.

Bentley filed suit under 42 U.S.C. § 1983, claiming that his Fourth Amendment rights against unreasonable search and seizure were violated when the Officers entered his property without warrant and arrested him without probable cause, and that he was subject to malicious prosecution. The claims against City of East Moline (II, IV, and VI) arise under an Illinois statute, 745 ILCS 10/9-102, that provides indemnification by a "local public entity" for tort judgments incurred by employees acting within the scope of their employment. Defendants have moved for summary judgment on all counts.

## DISCUSSION

**I.     Legal Standard on a Motion for Summary Judgment**

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Magin v. Monsanto*, 420 F.3d 679, 686 (7th Cir. 2005) (citing Fed. R. Civ. P. 56(c)); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). At the summary judgment stage, the judge's function is not to weigh the evidence and assess the truth of the matter but to determine whether there is a genuine issue for trial—that is, whether there is sufficient evidence favoring the non-moving party for a jury to return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir. 1997). There can be no genuine issue as to any material fact when a party "fails to make a showing sufficient to establish

the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

Where the parties' versions of events differ substantially, courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). In qualified immunity cases, this usually means adopting the plaintiff's version of the facts. *Scott*, 550 U.S. at 378. The court is not required to accept unwarranted factual inferences. *Stachowski v. Town of Cicero*, 425 F.3d 1075, 1078 (7th Cir. 2005).

## II. 42 U.S.C. 1983 and Qualified Immunity

### a. 1983

"In order to state a claim under § 1983, a plaintiff must sufficiently allege that (1) a person acting under color of state law (2) deprived him of a right, privilege, or immunity secured by the Constitution or laws of the United States." *London v. RBS Citizens, N.A.*, 600 F.3d 742, 745–46 (7th Cir. 2010).

### b. Qualified Immunity

"Qualified immunity is an entitlement to avoid trial." *Jones v. Clark*, 630 F.3d 677, 679 (7th Cir. 2011). It shields officials, including police officers, from harassment, distraction, and liability when they perform their duties reasonably, while ensuring that public officials are held accountable when they exercise power irresponsibly. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). An "official's right to immunity turns on two questions: first, whether the facts presented, taken in the light most favorable to the plaintiff, describe a violation of a constitutional right, and second, whether the federal right at issue was clearly established at the time that the alleged violation occurred." *Jones*, 630 F.3d at 680 (citing *Pearson*, 555 U.S. at

5

129). If the plaintiff cannot establish that the facts, "taken in the light most favorable to [him], show that the defendant violated a constitutional right," summary judgment for the defendant is appropriate. *See Jewett v. Anders*, 521 F.3d 818, 822–223 (7th Cir. 2008). In light of the Supreme Court's holding in *Pearson*, lower courts may look first to the second prong of the qualified immunity test—whether the constitutional right was clearly established—in consideration of the circumstances of the case. *Pearson*, 555 U.S. at 236.

The plaintiff can meet his burden of showing that a right is "clearly established by showing that there is a clearly analogous case establishing a right to be free from the specific conduct at issue or that the conduct is so egregious that no reasonable person could have believed that it would not violate clearly established rights." *Chelios v. Heavener*, 520 F.3d 678, 691 (7th Cir. 2008) (quotation marks omitted). "Although it is not necessary that a prior case address the precise factual situation confronting the officer, the unlawfulness of the officer's action should be clear in light of pre-existing law." *Jones by Jones v. Webb*, 45 F.3d 178, 183 (7th Cir. 1995) (quotation marks omitted).

The inquiry into whether a defendant violated clearly established law often relates to the sufficiency of the evidence supporting the underlying constitutional violation. *See Jones*, 630 F.3d at 679. For that reason, the Court will analyze the applicability of qualified immunity in conjunction with its analysis of whether genuine issues of material fact exist as to the alleged constitutional violation in each count.

### III. Count I False Arrest

Bentley alleges that the Officers falsely arrested him because he did not physically obstruct the Officers, and therefore they could not have had probable cause to arrest him under the Illinois statute that governs resisting or obstructing a peace officer. Pl.'s Mem. 18.

Defendants argue that probable cause did exist to arrest Bentley for resistance or obstruction, or, in the alternative, that arguable probable cause existed such that the Officers' actions were protected by qualified immunity. Def.'s Brief Supp. Mot. Summ. J. 25.

    a. **Legal Standard**

To set forth a section 1983 Fourth Amendment false-arrest claim, plaintiff must allege a state actor arrested him without probable cause. *See Bianchi v. McQueen*, 818 F.3d 309, 322 (7th Cir. 2016) (citing *Wallace v. Kato*, 549 U.S. 384, 389 (2007)). Therefore, "[t]he existence of probable cause to arrest is an absolute defense[.]" *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 713 (7th Cir. 2013). And the existence of probable cause depends, in first instance, on the underlying state criminal law at issue. *Jones*, 630 F.3d at 684. If, based on the totality of the facts and circumstances known to an officer at the time of arrest, a reasonable, prudent person could believe that the arrestee had committed, was committing, or was about to commit a crime, probable cause exists to justify an arrest. The inquiry into whether probable cause exists is "purely objective" but the facts and circumstances must be considered "as they would have appeared to a reasonable person in the position of the arresting officer–seeing what he saw, hearing what he heard." *Abbott*, 705 F.3d at 714 (quoting *Carmichael v. Vill. Of Palatine, Ill.*, 605 F.3d 451, 457 (7th Cir. 2010)). The probable cause standard allows for "reasonable mistakes," and, beyond that, "arguable probable cause" provides qualified immunity if "a reasonable officer could have believed [the arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed." *Abbott*, 705 F.3d at 714.

In Illinois, Resisting – Obstructing a Peace Officer is a Class A misdemeanor. 720 ILCS 5/31-1. It occurs when a person "knowingly resists or obstructs the performance by one known to the person to be a peace officer . . .of any authorized act within his or her official capacity . . ."

*Id.* The elements of the offense include "(1) knowing that one is a peace officer, (2) he or she knowingly resists or obstructs (3) the officer's performance of an authorized act." *Abbott*, 705 F.3d at 721.

In July 2013, when the events at issue took place, the Seventh Circuit had most recently considered the statute in *Abbott v. Sangamon County., Illinois.* in January 2013:

> The Illinois Supreme Court has held that section 5/31–1(a) does "not proscribe mere argument with a policeman about the validity of an arrest or other police action, but proscribe[s] only some physical act which imposes an obstacle which may impede, hinder, interrupt, prevent[,] or delay the performance of the officer's duties, such as going limp, forcefully resisting arrest[,] or physically aiding a third party to avoid arrest."

*Abbott*, 705 F.3d at 721. The court clearly stated that "verbal argument" and "refusal to identify oneself" were not sufficient to violate the statute. *Id.* The Seventh Circuit, prior to the *Abbott* decision, routinely reiterated its understanding that § 5/31–1 violations required a physical act. *See Williams v. Jaglowski*, 269 F.3d 778, 782 (7th Cir. 2001) (discussing the long history of the "physical act" requirement in Illinois state court decisions construing § 5/31–1 and finding that it was "still very much an element of the crime of obstructing a police officer in Illinois"); *Payne v. Pauley*, 337 F.3d 767, 776 (7th Cir. 2003) ("It is well settled under Illinois law—and was well settled at the time of [plaintiff's] arrest—however, that the resistance must be physical; mere argument will not suffice."); *Jones*, 630 F.3d at 684.

However, one year before the *Abbott* decision and the events at issue in this case, the Illinois Supreme Court decided *Illinois v. Baskerville*, 963 N.E.2d 898, 900 (Ill. 2012), which required the court to address whether the word "obstruct" in the statute could include providing false information to law enforcement, in essence requiring the court to decide whether a physical act was required to prove the offense of obstructing a peace officer. The Illinois Supreme Court held that while the statute had "most often been applied in connection with a physical act,"

8

physical obstruction "is neither an essential element of nor the exclusive means of committing an obstruction." *Baskerville*, 963 N.E.2d at 905.

At issue in *Baskerville* was whether a defendant had obstructed police when he lied about the whereabouts of his wife to officers who came to their home and asked to speak with her. *Id.* at 902. The Illinois Supreme Court again identified the distinctions between protected actions that fall within the purview of "free speech, rights of assembly and other constitutional concerns"—i.e. profanity-laden speech directed at an officer, or criticism of an officer—versus "conduct falling between mere argument and a physical act"—such as failure to leave after police order dispersal or refusal to comply with officer's order to exit a vehicle during traffic stop—that could constitute obstruction. *Id.* at 904, 905. The court reiterated that the statute focuses "on the tendency of the conduct to interpose an obstacle that impedes or hinders the officer in the performance of his authorized duties," *id.* at 905, and found that lying to an officer during an investigation (emphatically, the Court declared, not a protected form of speech) may have such an effect. Because *Baskerville* was decided after the conduct at issue in *Abbott*, the Seventh Circuit did not consider its applicability in *Abbott*; the same is not true for the arrest at issue here, and *Baskerville* applies.

**b. Analysis**

In order for Bentley's false arrest claim to survive the summary judgment phase, the Court must find that, when considered in the light most favorable to Bentley, the record indicates that the officers acted without probable cause or arguable probable cause when they arrested him for resisting or obstructing a peace officer.

Regarding whether Bentley knew that he was interacting with peace officers undertaking an authorized act, the undisputed facts indicate that a reasonable officer could have believed he

9

had effectively identified himself as a peace officer participating in an ongoing investigation. Though the Officers were in plainclothes, and Bentley stated that "[t]he word police officer was never spoken out loud never once," Bentley Dep. 49:24, Officer Schultz did attempt to show his badge on first contact with Bentley as they communicated through the window. Schultz Dep. 30:7 – 14; Bentley Dep. 62:22–63:9 (when asked whether the officers were wearing badges, Bentley testified that from the window, he saw Officer Schultz indicate toward his belt, "pointing to something."). Both Bentley and Stirk stated that at the initiation of the encounter with Bentley one of the Officers told him "we are investigating something." Stirk Dep. 24:21-24; Bentley Dep. 20 – 22. Additionally, Officer Shattuck told Bentley, "either you show me some ID or I'm going to arrest you." Though Bentley had every right to protect his private property from individuals who he believed to be interloping trespassers, the probable cause inquiry focuses on the facts "as they would have appeared to a reasonable person in the position of the arresting officer." *Abbott*, 705 F.3d at 714; *see also* Discussion of Officers' entry on to Bentley's property, *infra* Section V. No reasonable interpretation of the facts allows the Court to conclude that Shattuck and Shultz failed to identify themselves to Bentley as officers conducting an investigation. With the other elements of obstruction established, the question, then, is whether a reasonable officer could find that Bentley's actions "interpose[d] an obstacle that impede[d] or hinder[ed]" the Officers' investigation into the alleged planned disturbance. *Baskerville*, 963 N.E.2d at 906.

Undoubtedly, *Baskerville* did "mudd[y] the waters," Def.'s Reply 11, ECF No. 35, regarding the physical act requirement of § 5/31–1, but the line separating the illegal act of obstruction from the legal actions of an engaged or disgruntled citizen has long required measured judgment on the part of officers. *Abbott*, 705 F.3d at 722 (noting that "[t]he greatest

difficulty lies in determining the point at which mere verbal argument or refusal to act becomes an act of physical resistance or obstruction."). What Illinois courts have made clear, though, is that when an encounter is brief, and an individual is "merely disputing [an officer's] authority under the circumstances," such conduct does not rise to the level of hindrance to the officer's duties. *Illinois v. Berardi*, 948 N.E.2d 98, 103 (Ill. App. Ct. 2011) (overturning obstruction conviction of arrestee who made persistent refusals to leave a private office space, over a brief period of time, as he repeated several times his belief that he had a right to be in the space.) Here, the interaction between Bentley and the Officers leading up to his arrest lasted for only two to three minutes. Both Bentley and Stirk described Bentley's manner as "matter of fact," Bentley Dep. 64:10–13; Stirk Dep. 36:8, rather than continuously yelling, as the Officers described him. Shattuck Dep. 55:3–6.

Bentley stood several feet away from the Officers and did not attempt to run from the them, did not attempt to place himself in between the Officers and Stirk to physically inhibit questioning, nor did he make any factual misrepresentations that could have hindered the investigation. *See Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir. 2009) (reversing grant of summary judgment for officers when plaintiffs "neither tried to run, nor did anything more than insulate themselves from the officers' actions" and had "no opportunity" to resist); *Baskerville*, 963 N.E.2d at 908 (holding that husband did not obstruct a peace officer's duties after misrepresenting to officers that his wife, the object of an investigation, was not home, because delay was brief, he did not "hide" her, and husband ultimately allowed search of the home); *Cf. Martinez*, 717 N.E.2d at 539 (upholding conviction when defendant stepped between officer and individual being questioned, in close physical proximity, and told officer that he could not ask questions, in addition to cursing at the officer).

11

Defendants argue that Bentley impeded or hindered the investigation because he "interrupted the Officers to the point that they felt the need to divert their attention from Jason Stirk . . . to focus on Bentley," Def.'s Reply 11, but certainly not every instance in which an individual speaks to an officer—the natural result of which is to divert his attention—provides probable cause to arrest him for obstruction. *Gonzalez*, 578 F.3d at 538 ("The [district] court thought that probable cause existed because each of these plaintiffs approached the defendant officers while those officers were attempting to arrest another of the plaintiffs. But, without more evidence, there is nothing wrong in itself with approaching a police officer" to ask what is going on). Additionally, the Officers did not return to further investigate Stirk's possible activities after Bentley's arrest; at the very least, this suggests that there was little to no investigation left for Bentley to have hindered. Schultz Dep. 42:16–22 (Officer Schultz stated that after the arrest, "[a]t that point, it seemed like we deescalated the situation. Jason was–I didn't even know what happened to Jason after that.").

The question the Court must address is whether "no reasonable person could have believed that [the arrest] would not violate clearly established rights." *Chelios*, 520 F.3d at 691 (quotation marks omitted). The facts, taken in the light most favorable to Bentley, do not show that his conduct was an obstacle that materially hindered the Officers. *Baskerville* has not "muddied the waters" to such an extent that Bentley's conduct, as he tells it—telling the Officers to leave his private property and stating that he did not have identification—would constitute grounds for arrest. *Illinois v. Flannigan*, 267 N.E.2d 739, 742 (Ill. App. Ct. 1971) (holding that abusive language, or an "insubstantial display of antagonism or belligerence" cannot constitute resisting a police officer). If that were the case, the Illinois Supreme Court's definition of

12

"obstruction" would swallow the statute's built in protections for legal, constitutionally protected behavior.

When taken in the light most favorable to Bentley as the non-movant, the facts do not show that, as a matter of law, the officers had probable or even arguable probable cause to arrest him for resisting or obstructing a peace officer. In regard to the false arrest Counts I and II, the Officers may not use the shield of qualified immunity at the summary judgment stage, and a finder of fact should make a determination as to whether probable cause existed to arrest Bentley.

### IV.     Count III: Malicious Prosecution

Bentley alleges that the Officers' actions of arresting him for the crime of obstructing or resisting a peace officer was done maliciously, in violation of Bentley's Fourth Amendment right to be free from unreasonable seizure and actionable under § 1983. Compl. 5.

#### a.     Legal Standard

A federal constitutional tort will not lie unless the plaintiff makes a colorable claim for violation of a specific constitutional right. *See Tully v. Barada*, 599 F.3d 591, 595 (7th Cir. 2010); *Saunders-El v. Rohde*, 778 F.3d 556, 559–62 (7th Cir. 2015). The Supreme Court recently clarified that "the Fourth Amendment governs a claim for unlawful pretrial detention even beyond the start of legal process." *Manuel v. City of Joliet, Ill.*, No. 14-9496, 2017 WL 1050976, at *7 (U.S. Mar. 21, 2017). The Court left the Seventh Circuit to determine the elements on remand. *Id.* Most of the other circuits already recognize a Fourth Amendment malicious prosecution claim and require a plaintiff to show that the defendant "(1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal

13

proceedings terminated in plaintiff's favor." *Hernandez-Cuevas v. Taylor*, 723 F.3d 91, 101 (1st Cir. 2013).

In *Bianchi v. McQueen*, the plaintiffs alleged a Fourth Amendment false arrest claim, which the Seventh Circuit re-characterized as a malicious prosecution claim because plaintiffs were arrested "pursuant to formal legal process" (warrants issued pursuant to indictments). *Bianchi*, 818 F.3d at 322. The court acknowledged that it had net yet recognized the cause of action but concluded that even if it "were cognizable as a Fourth Amendment violation, [defendants] would still be entitled to qualified immunity [b]ecause the plaintiffs were immediately released on bond and were neither seized nor detained [and] suffered no Fourth Amendment injury." *Id.* at 323. Drawing from these cases, a plaintiff in the Seventh Circuit can likely allege a Fourth Amendment malicious prosecution/post-arrest pretrial detention claim if defendant (1) caused (2) a prolonged seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor.

Under Illinois law, the plaintiff in a malicious prosecution action must allege: "(1) he was subjected to judicial proceedings; (2) for which there was no probable cause; (3) the defendants instituted or continued the proceedings maliciously; (4) the proceedings were terminated in the plaintiff's favor; and (5) there was an injury." *Sneed v. Rybicki*, 146 F.3d 478, 480–81 (7th Cir. 1998).

**b. Analysis**

The lack of clarity in the case law on this matter is reflected in the manner Bentley pled his malicious prosecution claim and the manner in which the parties argued it. In any case, Bentley has neither sufficiently pled the elements of a state law malicious prosecution claim, nor a specific constitutional violation to sustain a § 1983 malicious prosecution claim.

14

Bentley, who was released on bail the same day of his arrest, offers only that he was made to "sweat it out" as the eighteen-month charging period passed, Pl.'s Resp. 28, but this does not constitute a liberty violation such that Bentley's Fourth Amendment rights would be implicated. *Bianchi*, 818 F.3d at 323. No criminal complaint was filed against Bentley: the furthest the case progressed was the Officers' presentation of the charges to the State's Attorney's office, which chose not to pursue the case.[3]

Bentley fails to present facts sufficient for a reasonable finder of fact to conclude that he was subject to malicious prosecution, and Count III must be dismissed.

V. **Count V: Unreasonable Search and Seizure**

Bentley's claim that the Officers violated his Fourth Amendment right to be free of unreasonable searches stems from their entry onto the curtilage of his property without search or arrest warrants. Pl.'s Resp. 28. Defendants argue that Bentley had no legitimate expectation of privacy in the area of the property entered by the Officers. Def.'s Brief Supp. Mot. Summ. J. 28.

a. **Legal Standard**

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV; *Bleavins v. Bartels*, 422 F.3d 445, 450 (7th Cir. 2005). A successful Fourth Amendment claim for unlawful search or entry requires that a plaintiff show "legitimate expectation of privacy that society recognizes as reasonable." *Bentz v. City of Kendallville*, 577 F.3d 776, 781 (7th Cir. 2009) (citing *California v. Ciraolo*, 476 U.S. 207, 211

---

[3] To argue that he has met the first prong of the state malicious prosecution test, Bentley points to an extremely broad definition of "judicial proceeding," taken from Black's Law Dictionary, but still provides no case law in support of the proposition that a prosecutor's failure to pursue charges in a court of law constitutes a judicial proceeding. *Black's Law Dictionary*, 849 (6th Ed. 1991) ("A proceeding in a legally constituted Court").

15

(1986)). The threshold question is therefore "whether the government violated the plaintiff's privacy interest." *Id.* at 782.

Though the home is the central focus of the Fourth Amendment's protections, the curtilage of the home—"the area outside the home itself but so close to and intimately connected with the home and the activities that normally go on there that it can reasonably be considered part of the home"– is also protected. *United States v. French*, 291 F.3d 945, 951 (7th Cir. 2002). The curtilage is "not necessarily" demarcated by a property line. *Id.* at 951. The Supreme Court, in *United States v. Dunn*, 480 U.S. 294 (1987), formulated a four-factor test to determine whether an area could be considered curtilage: (1) "the proximity of the area claimed to be curtilage to the home," (2) "whether the area is included within an enclosure surrounding the home," (3) "the nature of the uses to which the area is put, and" (4) "the steps taken by the resident to protect the area from observation by people passing by." *Id*. at 301. If not deemed curtilage, the "parts of one one's property that don't play host to private activities" are not protected under the Fourth Amendment. *United States v. Simms*, 626 F.3d 966, 970 (7th Cir. 2010) (citing *Oliver v. United States*, 466 U.S. 170, 180 (1984)). "Officers may walk up to that part of private property that is open to visitors or delivery people." *United States v. LePage*, 477 F.3d 485, 488 (7th Cir. 2007).

   b. **Analysis**

It is undisputed that the officers did not enter Bentley's apartment, but rather that the Officers walked over into the gravel lot from the Department, and that Officer Shattuck went some distance up the external staircase to speak with Jason Stirk, while Officer Shultz remained near the bottom of the staircase. Stirk, whom the Officers recognized from the photograph they pulled up on a database search, sat on the back staircase in plain view of the Officers as they

emerged from the Department. *French*, 291 F.3d 945, 954 (7th Cir. 2002) (holding that an officer with no warrant and a good faith belief that his probationer was working on cars at a specific property did not act unreasonably when he approached a person working on a car in plain sight at the rear entrance of the property).

Bentley's lot and rear staircase are fully visible from the public alley abutting his property. *See* Google Maps Images of Bentley's Property, Def.'s Mot. Summ. J. Exs. F, H, ECF Nos. 32-6, 32-8. Bentley did not testify to having taken precautions to make the lot more private, for instance by putting up any fences or gates to block entry into the lot or the staircase. *See French*, 291 F.3d at 953 (holding that no expectation of privacy existed where property owner "failed to produce any evidence that his driveway and/or gravel walkway were hidden from public view, inaccessible, or otherwise used for intimate activity."); *United States v. Villegas*, 495 F.3d 761, 767 (7th Cir. 2007) (finding no expectation of privacy in an unlocked apartment hallway, since "[e]xposing the activities within . . .[it] to the world is inconsistent with a subjective expectation of privacy.").

Bentley also presents evidence regarding his attempts to secure the lot behind the apartment. Bentley posted what he described as an "explicit" no parking sign indicating that unauthorized cars would be towed. A reasonable person could surmise, and Bentley corroborated, that the no parking sign existed to avoid being blocked in to his own parking lot, Bentley Dep. 38:17–21 – to prevent annoyance, rather than to "protect the area from observation by people passing by." *Dunn*, 480 U.S. at 301. Bentley relayed that at one point, the Police Department was storing traffic barriers on what he believed to be his property, so he called the Department to let them know he found it "inconvenient," but also noted that he "didn't really want to get into much of an argument about it."

17

It is Bentley's burden to produce to the Court case law demonstrating the "right to be free from the specific conduct at issue." *Chelios*, 520 F.3d at 691. Bentley introduces only one case to argue that the Officers' behavior was a clear constitutional violation: *Illinois v. Pittman*, 211 Ill.2d 502 (Ill. 2004), a case that dealt with a police search of a barn located fifty yards away from a home on a ninety-three acre farm. In light of the heavily circumstantial nature of the inquiry, the Illinois Supreme Court's analysis of the applicability of the *Dunn* test to a rural farm is inapposite when applied to a downtown apartment like the one at issue here.

Bentley has not met his burden of pointing the Court toward a clearly analogous case indicating that the Officers could not reasonably have believed that they were outside the curtilage of Bentley's home, and that their presence was not in violation of the Fourth Amendment. Without otherwise showing that the Officers' conduct "was so egregious that no reasonable person could have believed that it would not violate clearly established rights," the Officers' entry on to Bentley's property is protected by qualified immunity, and the related unreasonable search claim—Count V—must be dismissed.

## VI. Counts Against City of East Moline

Bentley does not allege any *Monell* claims[4] or any other federal claims against the City of East Moline. Instead, their inclusion in this suit is limited to seeking payment on any settlement generated or judgment entered. "A local public entity is . . . directed to pay any tort judgment or settlement for compensatory damages (and may pay any associated attorney's fees and costs) for

---

[4] "A government entity can be held liable under § 1983 when the execution of a government policy or custom is deemed to inflict an injury on a plaintiff." *Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015) (citing *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 694 (1978)). "The Supreme Court has recognized three particular grounds on which a municipality can be held liable under § 1983. There must be: (1) an express policy that would cause a constitutional deprivation if enforced; (2) a common practice that is so widespread and well-settled that it constitutes a custom or usage with the force of law even though it is not authorized by written law or express policy; or (3) an allegation that a person with final policy-making authority caused a constitutional injury." *Rossi*, 790 F.3d at 737.

which it or an employee . . . is liable . . . ." 745 ILCS 10/9-102. Because the Court has dismissed Bentley's alleged Fourth Amendment and state malicious prosecution claims and his Fourth Amendment unreasonable search and seizure claim, no judgment in favor of Bentley on those claims will be reached in this Court. Accordingly, Counts IV and VI against the City of East Moline are dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment, ECF No. 31, is DENIED as to the false arrest claim in Counts I and II. The motion is GRANTED regarding the Fourth Amendment malicious prosecution and unreasonable search and seizure claims in Counts III and V. Defendants' Motion for Summary Judgment as to the indemnification Counts IV and VI is GRANTED. Bentley's Motion for Leave to File Excess Pages, ECF No. 33, for his Response to the Motion for Summary Judgment, ECF No. 34, is GRANTED.

Entered March 30, 2017.

s/ Sara Darrow<br>
SARA DARROW<br>
UNITED STATES DISTRICT JUDGE